METRO EAST CAB COMPANY, INC., Petitioner-Appellant, v. LYNN QUIGLEY DOHERTY, Director of Employment Security, *et al.*, Respondents-Appellees.

Fifth District   No. 5—97—0920

Opinion filed January 21, 1999.

John J. Moellering and Neal F. Perryman, both of Lewis, Rice & Fingersh, of St. Louis, Missouri, for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Darryl B. Simko, Assistant Attorney General, of counsel), for appellees.

JUSTICE MAAG delivered the opinion of the court:

Respondent, the Department of Employment Security (Department), assessed contributions, interest, and penalties that it claimed were due under the Unemployment Compensation Act (820 ILCS 405/205 (West 1992)) against petitioner, Metro East Cab Company, Inc. (Metro East). The assessment covered unpaid contributions for certain quarters in the years 1991, 1992, 1994, and 1995. The contributions were estimated using numbers from Metro East's 1993 dispatch sheets. The Department determined that cab drivers who leased vehicles from Metro East were performing services in employment for that company. The Department also decided that Metro East failed to prove that the drivers were independent contractors as defined in the Unemployment Compensation Act (820 ILCS 405/212 (West 1992)).

Metro East protested the assessment and the method by which the unpaid contributions were calculated. After a hearing, the Director of Employment Security (Director) affirmed the assessment and the amounts figured for unpaid contributions. Metro East then filed a complaint for administrative review in the circuit court of St. Clair County, Illinois. The circuit court affirmed the findings of the Director. Metro East filed this appeal challenging the circuit court's order and the Director's findings regarding the employment status of the drivers and the method by which the contributions were calculated.

The pertinent facts are as follows. Metro East Cab Company, Inc., is an Illinois corporation, owned and operated by Ronnie F. McCoy. During the relevant period, Metro East possessed a certificate of convenience and necessity issued by the city council of East St. Louis for the operation of taxicabs. Metro East owned 29 cars that it leased to taxicab drivers. Metro East employed one mechanic and five dispatch-

ers. As of 1995, Metro East charged individual drivers a lease fee of $56 to lease a car for a 24-hour period. Metro Cab had increased its lease fee between 1990 and 1995 from $50 to $56 to cover increased operating costs, including insurance coverage. Metro East leased its vehicles for only 24-hour time periods. There were no 12-hour leases. All lease agreements were oral.

As part of the lease, each driver received a car equipped with a radio. Each driver was also offered the use of a "round the clock" dispatching service run by Metro East. Metro East provided the insurance coverage for all cars operating as taxicabs. Metro East provided oil for the vehicles and serviced them as necessary in order to ensure they were properly maintained. When a driver picked up a car, its gas tank was full. Drivers were required to return the vehicles with a full tank of gas. The drivers paid for their own gas. Metro East did not dictate where drivers purchased their gas. Metro East did not reimburse the drivers for gas they used. The drivers washed the cars when they deemed it necessary. The drivers were not reimbursed by Metro East for this expense.

Before Metro East would lease a cab to an individual, the individual was required to obtain a permit from the City of East St. Louis to operate a cab. Without this taxi permit, Metro East would not lease the car. Each driver was required to pay for the permit and all incidental expenses necessary to obtain it. Metro East did not reimburse the drivers for these expenses. Metro East did not require the drivers to complete any training before it would lease a vehicle to a driver. A new driver could make arrangements to ride with an experienced driver to learn the names of streets and the street layout in the area.

Metro East did not set fare schedules for the drivers. Fare schedules were set by the City of East St. Louis. The City of East St. Louis also had an ordinance that required taxi drivers to wear uniforms. Metro East had no such requirement. It did not provide uniforms for the drivers. They rented uniforms from a shop in East St. Louis. Drivers were required to pay for their own uniforms. Metro East did not reimburse the drivers for that expense. The City of East St. Louis also required all cars under a particular certificate to be of uniform color. In compliance with this ordinance, Metro East's cars displayed the name and telephone number of the company and were uniform in color.

As part of the lease fee, Metro East included a dispatch service. Drivers were given an opportunity to obtain passengers through Metro East's radio dispatch service but were not required to accept any call. Metro East did not sanction drivers for refusing to accept dispatched

calls. Metro East did not keep a record of whether drivers actually picked up and transported dispatched passengers to their destinations or what fees were collected. Metro East did not keep any records documenting the number of dispatched passengers any particular driver accepted and transported.

Metro East did not receive any percentage of the driver's fares. There was no fee sharing. Metro East did not monitor the number of customers transported, the number of miles driven, or the amount of fares collected by the drivers. Each driver set his own schedule and worked as many hours as he chose. Metro East did not require the drivers to furnish a record of their hours or fares.

Metro East did not have any rules prohibiting the drivers from soliciting, obtaining, and maintaining their own contracts for cab services. Some drivers had personal customers. The drivers were not bound by any form of noncompete agreement and could work for other cab companies and transportation services both within and outside of East St. Louis. Drivers could pursue other types of employment. Some drivers engaged in other employment. Metro East did not assign routes to its drivers. It did not control or limit the territories in which each driver operated. Metro East did not furnish business cards, taxi stands, expense accounts, or other supplies to its drivers.

Metro East had one contract that it had negotiated with the Illinois Board of Education to transport "handicapped" children to and from school. The contract called for transportation of six to eight children during the regular school year. The Board of Education paid Metro East. Metro East offered to subcontract the transportation of these children to the drivers. If drivers declined to transport the children, the owner of Metro East transported them. Drivers were not required to transport these children and were not sanctioned for declining this work. If the drivers did accept the work, Metro East paid the drivers from the funds provided by the Board.

Metro East did not guarantee the services performed by drivers. It did not bond them. Metro East did not carry worker's compensation insurance on the drivers. It did not deduct social security tax from the drivers' income. Metro East did not keep records of the drivers' income. It did not report the drivers to the Internal Revenue Service and did not issue W-2 forms. The drivers did not receive pensions, bonuses, paid vacation, or sick leave.

Larry King, an employee of the Illinois Department of Employment Security, performed the field audit on Metro East that resulted in the assessments. This was a random audit. It was the first time that King audited a cab company. King stated that he made certain assumptions before he conducted audits. King testified that when he

conducts field audits, he assumes employment unless it is demonstrated otherwise. He presumes that a business controls its workers. The burden is on the company to rebut his presumption.

King stated that he did not consider East St. Louis ordinances governing the operation of taxicabs. He did not interview any of the drivers. King reviewed Metro East's dispatcher's log, on which dispatchers listed the calls it received for cabs. However, this log did not document whether the customer was actually picked up. King spoke with Metro East's owner, Ronnie McCoy. He required McCoy to furnish written responses to a questionnaire regarding Metro East's business operations. Upon completing the investigation, King decided that the drivers were employees of Metro Cab, based upon his conclusion that the company controlled the drivers. After a hearing, the Director affirmed the assessment.

■ At the outset, we note that the standard of review is a matter of disagreement between the parties. Therefore, we will set forth the applicable standard before addressing the merits. In this case, the pertinent facts are not in dispute. Rather, the case involves the legal significance of those facts to the question of the employment status of the drivers. We are asked to review whether the Director reached the correct legal conclusion regarding the employment issue. Thus, we must conduct an independent analysis to determine whether the Director considered all of the facts and properly applied the facts to the relevant law. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 692 N.E.2d 295 (1998). As to the employment issue, we are not bound by the circuit court's determination or the Director's determination. Rather, because the issue presents a mixed question of fact and law, we apply the "clearly erroneous" standard of review. *City of Belvidere*, 181 Ill. 2d 191, 692 N.E.2d 295.

■ The Unemployment Insurance Act defines employment as "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 1992). From this broad definition, which includes relationships not ordinarily considered to constitute employment, there are a number of statutory exceptions, including one for independent contractors. *Parks Cab Co. v. Annunzio*, 412 Ill. 549, 552, 107 N.E.2d 853, 854 (1952). During proceedings before the Director, the circuit court, and this court, the parties have advanced arguments regarding whether the cab drivers performed services for Metro East and whether the drivers fit within the independent contractor exception. Employment does not exist under this statute unless an individual is performing service for an employing unit. Therefore, we must first consider that question. We will not address the applicability of the independent contractor exception unless we find that the drivers performed services for Metro East during the relevant period.

In discussing their respective positions, both parties have directed us to a number of the same cases (*e.g., Parks Cab Co.*, 412 Ill. 549, 107 N.E.2d 853; *Myers v. Cummins*, 9 Ill. 2d 582, 138 N.E.2d 491 (1956); *Gladstone Cab Co. v. Donnelly*, 30 Ill. 2d 465, 197 N.E.2d 3 (1964); *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 596 N.E.2d 795 (1992)). Significantly, the outcome of each case turned on its own distinct facts.

In *Gladstone Cab Co.*, 30 Ill. 2d 465, 197 N.E.2d 3, the court found that cab drivers provided services to the company. In that case, the drivers were required to report their destinations on trips so that the company knew exactly where the drivers were at any given moment. The company checked the mileage on the vehicles against the fares collected to make sure the drivers brought in enough money. One-half of the metered fares collected were turned over to the company. The company provided telephones, offices, waiting rooms, and cab stands to the drivers without any charge. Looking at the economic realities, the court found that unless the cabs operated, the company had no income.

Similarly, in *Myers*, 9 Ill. 2d 582, 138 N.E.2d 491, the owner of a licensed cab operation leased cabs to drivers for one-half of the fares collected. The owner maintained cab stands and waiting rooms for the drivers but, to maintain those facilities, required them to pay a contribution of $1 from their portion of each shift's fares. The owner dictated where the drivers could purchase gas, required the drivers to abide by all rules and regulations of the owner, and required the drivers to join a cab union. The owner also ran a classified ad in the telephone directory. The Illinois Supreme Court found that financial interdependence had been established because the facts demonstrated that if the cabs did not operate, the company collected no income, and as such the court held that the drivers performed services for the employer. The court went on to determine that the drivers did not qualify as independent contractors because the company exerted not only general but extensive control over the performance of the drivers' services. In *O'Hare-Midway Limousine Service, Inc.*, 232 Ill. App. 3d 108, 596 N.E.2d 795, limousine drivers were found to be performing employment services for O'Hare-Midway Limousine. The drivers were required to accept and transport customers who had booked services with O'Hare-Midway Limousine. They were required to pay a percentage of their commissions to the company. The court found that the facts established a financial interdependence, that the drivers had a direct financial stake with the limousine company, and that the company had some control over the performance of the drivers.

In *Parks Cab Co.*, 412 Ill. 549, 107 N.E.2d 853, the cab company

had 13 taxicab licenses but owned no cabs. The cab company leased its taxi licenses to persons who owned cars, for a rental fee of $60 per week. The company agreed to carry insurance on the cabs. The lessees were required to report accidents, to bear the costs of repairs and operating expenses, and to transfer the title of their vehicles to the company for security and indemnity. The company did not require the drivers to wear uniforms, to paint the cars a uniform color, to refrain from hiring other drivers to drive the cabs, or to report monetary earnings.

The court ignored the labels and characterizations of the parties and looked instead to the economic reality. The court concluded that the actual situation was one where an individual, who owned a vehicle, wanted to engage in the taxicab business but could not because he had no license, and a company had licenses but did not want to engage in the operations of a taxicab business. The court found that the company's interest in the taxicab operations ceased with the leasing of the licenses and that by its lease the company relinquished all control over the operation of the cabs. It concluded that the company was in the business of leasing taxicab licenses and that in that business the drivers render no services for it. *Parks Cab Co.*, 412 Ill. at 553, 107 N.E.2d at 855.

In each of those cases, the reviewing court considered all of the facts in evidence and determined whether those facts established financial interdependence between the company and the worker. Evidence of control was a factor in determining interdependence. The cases clearly establish that the specific facts must be considered in light of the "realities of economic life." *Parks Cab Co.*, 412 Ill. at 553, 107 N.E.2d at 855; *Gladstone Cab Co.*, 30 Ill. 2d at 472, 197 N.E.2d at 7.

■ After carefully reviewing the Director's decision, we find that the Director failed to consider all of the facts in light of the economic realities and misapplied the facts in light of the relevant case law. In her decision, the Director placed great weight upon the fact that the owner provided a dispatch service. The provision of a dispatch service is a fact that may be pertinent to the issue of financial interdependence. However, that fact alone does not establish financial interdependence and control over the drivers. It cannot be considered in a vacuum. Nor can it be divorced from economic reality.

Unlike the employers in *Gladstone Cab Co.*, *Myers*, and *O'Hare-Midway Limousine Service, Inc.*, the evidence here demonstrates that Metro East derived no direct economic benefit as a result of providing a dispatch service. Metro East did not share in any part of the fares that the drivers collected from passengers that Metro East dispatched.

Metro East's lease fee was a flat fee. It did not fluctuate daily, weekly, or monthly based upon the number of calls it received for cab service. Further, Metro East did not force the drivers to accept dispatched passengers as a condition of the lease. Metro East continued to lease its vehicles to drivers whether they accepted or declined dispatched passengers. The drivers were not penalized for refusing to accept dispatched passengers.

The Director rejected Metro East's arguments that the Metro East operation was analogous to the company's operation in *Parks Cab Co.* In the decision, the Director found, "[W]hat distinguishes the instant case from *Parks [Cab Co.]* is that here the company actively dispatched the drivers in its cabs."

Following the Director's reasoning could lead to illogical and unjust results. To illustrate the problem, we have provided the following set of hypothetical facts. RENT-A-CENTER is a company that leases lawn-and-garden equipment. All of its rental equipment is painted a uniform color and contains the corporate logo. A landscaper leases a backhoe from RENT-A-CENTER for his landscaping business. On the day he leases the backhoe, the RENT-A-CENTER manager gives the landscaper a list of names of people who had called the store about landscaping services. The manager tells him to call them if he is interested in the business. The landscaper calls people on the list and obtains some new customers. As a result of the extra business, the landscaper must lease the backhoe for a longer period. Under the Director's reasoning, the landscaper could be found to be rendering services for RENT-A-CENTER.

Considering these hypothetical facts in light of the economic realities, whether the landscaper contacted the people on the list was of no real concern to the business of RENT-A-CENTER. RENT-A-CENTER was in the business of renting equipment, not landscaping. While RENT-A-CENTER might derive some economic benefit indirectly if the landscaper obtained more business and thereby rented the equipment for a longer time period, it has no direct financial stake in the performance of the landscaper. It has no right to exert control over that landscaper and could not force him to perform services for the people on the list. RENT-A-CENTER was completely divorced from the operations of the landscaper. Similarly, the facts demonstrate that Metro East's business was divorced from the operations of the cab drivers.

In our view, the facts of this case are closely aligned with those in *Parks Cab Co.*, 412 Ill. 549, 107 N.E.2d 853. Metro East is a company that owns automobiles and a certificate of need to operate a cab service in the City of East St. Louis. Metro East is in the business of leas-

ing cars to individuals who have city permits to operate cabs. As part of the lease fee, Metro East provides drivers an opportunity to use its dispatch services. Based upon the record, those who lease Metro East's vehicles wanted to work as cab drivers but could not because they did not own cabs and did not have a certificate of need. Metro East owned insured vehicles and possessed the necessary certificate but had no interest in operating a taxicab service.

Based upon this arrangement, Metro East was not concerned with the operation of the cab or the amount, if any, of miles driven or fares earned by the individual drivers. Metro East's income was not directly dependent upon the drivers having a busy day or a slow day. It was not dependent upon the ambition or lack thereof of the drivers. Metro East derived the same income whether a driver operated the cab or let it sit idle. The company's income was derived from a flat lease fee of $56. The company's income was not affected by whether the driver made $10 or $300 during the 24-hour lease period, because it neither claimed nor obtained any share of the fares. The company was in the business of leasing taxicabs. There is no evidence from which to establish that Metro East had a direct financial stake in the operations of the drivers or vice versa. Once the driver displayed his permit and paid the lease fee, Metro East relinquished its vehicle and made no attempt to control the driver. Metro East's financial interest in regard to cab operations ceased once its vehicle had been leased. Apart from tort liability and damage to its vehicles, Metro East was not concerned with the operation of the cabs or the income generated from the operation of those cabs. Metro East exerted no control over the drivers. It could not force them to accept the calls it dispatched. It could not and did not sanction them for failing to accept a fare it dispatched. Its business was not dependent upon the success of its drivers.

Based upon all of the facts and in light of the economic realities, we find no evidence of economic interdependence. Based upon the record before us, we find no evidence to support a conclusion that the drivers were performing services for Metro East. Metro East's income was not dependent upon the driver's performance. The economic realities demonstrate that the relationship is one of a lessor and a lessee. Therefore, we find that the facts do not establish that the drivers were performing services for Metro East as contemplated by section 206 of the Unemployment Insurance Act (820 ILCS 405/206 (West 1992)).

Accordingly, the judgment of the circuit court is reversed, and the Director's decision is set aside. Pursuant to Supreme Court Rule

366(a)(5) (134 Ill. 2d R. 366(a)(5)), judgment is hereby entered in favor of Metro-East Cab Company, Inc.

Judgment reversed; judgment entered in favor of petitioner.

WELCH and HOPKINS, JJ., concur.